Stephen M. FLATOW, Plaintiff–Appellant,

Bank Saderat Iran, Claimant–Appellee,

v.

The ISLAMIC REPUBLIC OF IRAN, Defendant.

No. 00–56446.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 2001.

Filed Oct. 23, 2002.

Thomas Fortune Fay, and Jane Carol Norman, Washington, DC, for the appellant.

Steven W. Kerekes, Beverly Hills, CA, for the appellee.

Robert D. McCallum, Jr., Assistant Attorney General, Patrick K. O'Toole, United States Attorney, and Douglas N. Letter, H. Thomas Byron III, and Anne Murphy, Attorneys, USDJ, Washington, DC, for the amicus, United States Department of Justice.

Ellen Pattin, Olney, MD, for the amicus, Marine Corps Aviation Association.

Before: BRIGHT *, B. FLETCHER, and FISHER, Circuit Judges.

BRIGHT, Circuit Judge.

Petitioner Stephen M. Flatow appeals the dismissal of his action to levy against California real estate owned by Bank Saderat Iran ("BSI") pursuant to a default judgment entered against the Islamic Republic of Iran by the United States District Court for the District of Columbia. The District Court for the Southern District of California agreed with BSI that the property in question was not an asset of the judgment debtor and therefore released proceeds from the sale of the property and terminated Flatow's action. We affirm the district court.

## I. BACKGROUND

On April 9, 1995, Alisa Flatow, an American college student spending a semester studying in Israel, was killed in an explosion when the bus in which she was traveling collided with a van loaded with explosives. The United States Department of State later concluded that the Shaqiqi faction of the Palestine Islamic

---

* The Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Jihad[1] committed the bombing. The State Department also determined that the Islamic Republic of Iran provided material support and resources to the Palestine Islamic Jihad.[2]

Shortly after the bombing, Congress amended the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), effective April 24, 1996. The Act created an exception to the sovereign immunity of those foreign states officially designated by the Department of State as terrorist states if the foreign state commits a terrorist act, or provides material support and resources to an individual or entity that commits such an act, which results in the death or personal injury of a United States citizen. *See* 28 U.S.C. § 1605(a)(7). Congress also expressly provided that punitive damages be available in actions brought under the state-sponsored terrorism exception to sovereign immunity. *See* 28 U.S.C. § 1605 statutory note.[3] This provision is commonly referred to as the "Flatow Amendment."

Relying upon these new provisions, Stephen M. Flatow, as Alisa's father and executor of her estate, filed a wrongful death complaint against Iran and its officials on February 26, 1997, in the United States District Court for the District of Columbia. On March 11, 1998, the district court entered a default judgment against Iran in favor of Flatow in the amount of $247,513,220. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1 (D.D.C.1998).

In the instant matter, Flatow registered his judgment with the District Court for the Southern District of California on April 23, 1999. On September 14, 1999, Flatow obtained a writ of execution for $247,513,220.00 on property in Carlsbad, California, owned by California Land Holding Company, a wholly-owned subsidiary of BSI. As the California Land Holding Company was about to sell the property, Flatow and BSI agreed that the writ of execution should be released from the property so that escrow could close. Pursuant to a consent order entered on October 1, 1999, the proceeds of the sale were held in an interest-bearing account subject to the lien created by the writ of execution.

BSI filed its initial motion for the release of the money on November 1, 1999. After extensive briefing by the parties and the United States government,[4] as well as

---

1. Palestine Islamic Jihad is a collection of loosely affiliated factions rather than a cohesive group. The Shaqiqi faction is a terrorist cell with a small core membership whose goal is to conduct terrorist activities in the Gaza region. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 8 (D.D.C.1998).

2. The Shaqiqi faction's sole source of funding is the Iranian government, from which the group receives approximately two million dollars annually. *Flatow,* 999 F.Supp. at 8–9.

3. "The Flatow Amendment is apparently an independent pronouncement of law, yet it has been published as a note to 28 U.S.C. § 1605, and requires several references to 28 U.S.C. § 1605(a)(7) *et seq.* to reach even a preliminary interpretation." *Flatow,* 999 F.Supp. at 12.

4. On February 28, 2000, the district court ordered the United States to file briefing on the effect of Presidential Determination No. 99–1, which waived the requirements of 28 U.S.C. § 1610(f)(1)(A) on the same day that subsection was enacted, pursuant to waiver authority supplied by Congress. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub.L. 105–277, § 117, 112 Stat. 2681–491–92 (Oct. 21, 1998) (enacting, as § 117(a), the language now codified at § 1610(f)(1)(A), and providing in § 117(d) that "[t]he President may waive the requirements of this section in the interest of national security"). The government filed a statement of interest on April 3, 2000, which explained that the Presidential waiver deactivated the provision codified at § 1610(f)(1)(A). The United States concluded

oral argument on whether BSI's assets could be used to satisfy a judgment against the Islamic Republic of Iran, the district court issued an order on May 22, 2000, denying without prejudice BSI's motion for release of the funds held pursuant to the consent order. The court found that the evidence Flatow presented was not sufficient to overcome the presumption that BSI is a juridical entity separate and apart from the Islamic Republic of Iran and therefore BSI was not subject to execution of the judgment against Iran. In making this determination, the court relied upon the Supreme Court's *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (hereinafter *"Bancec"*) (holding that unless the entity is found to be "so extensively controlled by [the foreign state] that a relationship of principal and agent is created" or recognizing the entity as separate "would work fraud or injustice," the FSIA does not permit execution upon the entity's assets).[5] However, the court permitted Flatow to conduct discovery on the limited issue of whether Iran exercised day-to-day control over the operations of BSI.

The court allowed Flatow to pursue discovery until July 31, 2000. BSI then filed its renewed motion for release of the Carlsbad land sale money. Flatow argued in opposition that BSI is "extensively con-trolled" by Iran because all Iranian banks including BSI were nationalized following the 1979 revolution. Flatow submitted a copy of the Iranian Constitution, which states that banking, as well as insurance, power generation, post, telegraph and telephone services, and other large-scale industries "will be publicly owned and administered by the State." The district court concluded that this evidence did not show that Iran exerts day-to-day control over BSI as required by *Bancec*, 462 U.S. at 629–31, 103 S.Ct. 2591. The district court also rejected Flatow's alternative argument under *Bancec's* fraud or injustice exception, *id.*, to the presumption of BSI's status as a separate juridical entity.

During the course of discovery, Flatow requested the assistance of the court under the Hague Convention, 28 U.S.C. § 1781, to take depositions of former Iranian President Bani Sadr, who had been exiled to Paris, France, and former Iranian intelligence operative Ahmad Behbahani, who had been exiled to Turkey. The district court denied this request and entered a protective order under Federal Rule of Civil Procedure 26(c) so that the depositions of Bani Sadr and Behbahani could not proceed.

The district court granted BSI's motion for the release of the money and terminat-

that none of the assets of BSI that Flatow sought to attach were blocked from execution under the International Emergency Economic Powers Act ("IEEPA") or its implementing regulations. *See* Statement of Interest at 8.

The district court considered the government's conclusion and determined that it was inconsistent with the text of the license under which the Carlsbad property was sold because that license was granted under one of the IEEPA sections specifically listed in the Presidential Determination as immune from attachment. However, the district court determined that clarification of this matter was

unnecessary because by order entered May 19, 2000, it determined that the threshold issue is whether property belonging to BSI may be attached in aid of execution of a judgment against the Islamic Republic of Iran. Because we affirm the district court on its resolution of this question, we do not address the application of Presidential Determination No. 99–1 to this case.

5. In its April 3, 2000 statement of interest, the United States took no position on the *Bancec* issue of whether BSI could be held liable for the judgment against Iran.

ed the case. Flatow timely appeals.[6]

## II. STANDARD OF REVIEW

■ We review the district court's findings of fact for clear error. *See Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir.2001); *Troutt v. Colorado Western Ins. Co.*, 246 F.3d 1150, 1156 (9th Cir.2001). The district court's conclusions of law are reviewed *de novo. See In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1045 (9th Cir.2001); *Troutt*, 246 F.3d at 1156. And we review the grant or denial of a protective order for an abuse of discretion. *See Anderson v. Calderon*, 232 F.3d 1053, 1099 (9th Cir.2000); *Portland Gen. Elec. Co. v. U.S. Bank Trust Nat'l Ass'n*, 218 F.3d 1085, 1089 (9th Cir.2000).

## III. DISCUSSION

### A. Separate Juridical Entity Analysis

In Bancec, the Supreme Court clearly stated that the FSIA does not govern substantive liability for foreign states or their instrumentalities. *See* 462 U.S. at 620, 103 S.Ct. 2591 ("The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state."). The enumerated exceptions to the FSIA provide the exclusive source of subject matter jurisdiction over civil actions brought against foreign states, *see Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–35, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), but the FSIA does not resolve questions of liability. Questions of liability are addressed by Bancec, which examines the circumstances under which a foreign entity can be held substantively liable for the foreign government's judgment debt. This distinction between liability and jurisdiction is crucial to our resolution of this case.

In *Bancec*, the government of Cuba expropriated property from First National City Bank (subsequently known as "Citibank"). Citibank asserted a set-off against the plaintiff Bancec based upon the Cuban government's seizure of Citibank's Cuban assets. 462 U.S. at 616, 103 S.Ct. 2591. The Court addressed the issue of

---

**6.** On October 28, 2000, the Victims of Trafficking and Violence Protection Act of 2000 became law. This statute permitted certain victims of terrorist acts to collect 100% of their compensatory damages from the United States government. *See* Victims Protection Act, § 2002(a)(1)(B). Flatow exercised this right, and was paid $26. million by the Department of Treasury on January 4, 2001. This amount constitutes Flatow's compensatory damages award. He still retains the right to execute his punitive damages award.

In its amicus curiae brief to this panel, the United States argues that Flatow has relinquished his right to execute the punitive damages judgment against the Carlsbad property at issue in this case. The government contends that when he signed the relinquishment of rights that rendered him eligible, under the terms of Section 2002, for the $26 million in compensatory damages and interest, he gave up his right to "execute against or attach property that is at issue in claims against the United States before an international tribunal, that is the subject of awards rendered by such tribunal, or that is subject to section 1610(f)(1)(A) of title 28, United States Code." (Amicus Br. at 21–22). According to the government, the Carlsbad property falls into the category of property to which Flatow has waived his execution rights.

Because Flatow accepted the $26 million award on January 4, 2001 and the district court in the instant case made its final ruling on June 30, 2000, the district court did not consider this issue. Neither of the parties raised this argument in their briefs or in oral argument. We elect to resolve this case on the same grounds as the district court, and make no determination on the government's argument that Flatow has relinquished his rights to pursue the Carlsbad property under Section 2002.

whether the acts and liabilities of the foreign sovereign government of Cuba could be attributed to the state-owned banking entity, Bancec.

The Court held that Bancec was not an entity independent from the Cuban government. *Id.* at 633, 103 S.Ct. 2591. In making this determination, the Court noted that Bancec had been dissolved and its capital split between a Cuban national bank and the foreign trade enterprises of the Cuban Ministry of Foreign Trade. *Id.* at 632, 103 S.Ct. 2591. Furthermore, Bancec was empowered to act as the Cuban government's exclusive agent in foreign trade, the government supplied all of Bancec's capital and owned all of its stock, and all of Bancec's profits were deposited in the General Treasury. Bancec's Governing Board consisted of delegates from Cuban government ministries and the president of Bancec was the Minister of State. *See Bancec,* 462 U.S. at 614, 103 S.Ct. 2591. The Court explained, "To hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entities whenever the need arises." *Id.* at 633, 103 S.Ct. 2591.[7]

Nonetheless, under *Bancec,* even though an entity or instrumentality is wholly-owned by a foreign state, that entity is accorded the presumption of independent and separate legal status. *Id.* at 627–28, 103 S.Ct. 2591. *Bancec* outlined the features typical of a separate government instrumentality:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Id.* at 624, 103 S.Ct. 2591.

The Court indicated that the presumption of separate juridical status may be overcome in two ways. First, where it can be shown that the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." *Id.* at 629, 103 S.Ct. 2591. Second, an instrumentality should not be deemed a separate juridical entity where doing so would work "fraud or injustice." *Id.*[8] Having laid out these two exceptions to the presumption of separate juridical status, the Court de-

---

7. On the other hand, the Court did caution that "[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee." *Bancec,* 462 U.S. at 626, 103 S.Ct. 2591.

8. Flatow's briefs and argument to this court focus solely on the first *Bancec* exception. However, at the district court level, he argued that it would be unjust to recognize BSI as a separate juridical entity. The district court, in its May 19, 2000, order, rejected this argument because Flatow has not claimed that BSI participated in the terrorist acts that gave rise to this litigation, or that BSI is a sham entity established to allow Iran to avoid liability. Flatow does not appeal this ruling.

clined to provide a "mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded." *Id.* at 633, 103 S.Ct. 2591.[9]

Flatow argues that the district court erred in applying Bancec and concluding that BSI is a separate juridical entity, which cannot be held liable for Flatow's judgment against Iran.[10] Flatow rests his argument almost entirely upon the contention that the Iranian Constitution, which nationalized the banking industry after the 1979 Iranian revolution, creates a principal-agent relationship between BSI and the Iranian government.[11] Flatow argues that this fact alone demonstrates the control required by Bancec to preclude an entity from separate juridical status.[12]

9. At least one circuit court has articulated five *Bancec* factors: "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines,* 965 F.2d 1375, 1380 n. 7 (5th Cir.1992).

10. Flatow argues in his reply brief that amendments to Section 1605(a)(7) of the FSIA were intended to alter the application of *Bancec's* presumption of separate juridical entity status for foreign instrumentalities. The district court rejected this argument and cited two other decisions rejecting this position: *Flatow v. Islamic Republic of Iran,* 67 F.Supp.2d 535, 539 (D.Md.1999) (holding there is nothing in the language of § 1605(a)(7) itself or the legislative history that indicates Congress intended the new provision to abrogate the Bancec presumption); *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.,* 183 F.3d 1277 (11th Cir. 1999) (reversing a district court decision that the Bancec presumption could more easily be overcome in situations where families were attempting to satisfy judgments obtained as a result of terrorist acts).

We asked the United States to file an amicus curiae brief on the issue of whether amendments to the FSIA abrogate the Bancec presumption. The United States took the position that the amendments to the FSIA did not alter the Bancec presumption because Bancec and the FSIA govern two separate questions of law: liability and jurisdiction. It is now clear to the panel that the district court was correct in resolving this matter under the threshold Bancec liability inquiry. Thus we limit our resolution of the matter to that ground.

11. Article 44 of the Constitution of the Islamic Republic of Iran states:

(1) The economy of the Islamic Republic of Iran is to consist of three sectors: state, cooperative, and private, and is to be based on systematic and sound planning.
(2) The state sector is to include all large-scale and mother industries, foreign trade, major minerals, banking, insurance, power generation, dams, and large-scale irrigation networks, radio and television, post, telegraph and telephone services, aviation, shipping, roads, railroads and the like; all these will be publicly owned and adMinistered [sic] by the State.
(3) The cooperative sector is to include cooperative companies and enterprises concerned with production and distribution, in urban and rural areas, in accordance with Islamic criteria.
(4) The private sector consists of those activities concerned with agriculture, animal husbandry, industry, trade, and services that supplement the economic activities of the state and cooperative sectors.
(5) Ownership in each of these three sectors is protected by the laws of the Islamic Republic, in so far as this ownership is in conformity with the other articles of this chapter, does not go beyond the bounds of Islamic law, contributes to the economic growth and progress of the country and does not harm society.
(6) The scope of each of these sectors as well as the regulations and conditions governing their operation, will be specified by law.

12. Flatow also argues that demonstrating "actual day to day supervision" could never

The district court considered and rejected this argument in a thorough, well-reasoned opinion. Specifically, the court concluded that the facts of this case are different from those in *Bancec*. The court found that Flatow had not shown that BSI operates as an arm of the Iranian government or that BSI's mission is to further the policies of the Iranian government. Additionally, unlike in *Bancec*, BSI is not attempting to use a United States court to recover on a claim while at the same time trying to avoid being the subject of an adversary proceeding. BSI is a nonparty to the underlying case.

In rejecting Flatow's principal-agent argument, the district court also pointed out that BSI is an Iranian corporation, organized under the banking laws of Iran as a banking corporation, but it has its own Articles of Association.[13] BSI was founded in 1952 and until 1979,[14] BSI was a privately owned bank. BSI consists of more than 3000 branch offices throughout the Middle East, London, Paris, Hamburg, and New York. The New York office is the only office BSI has in the United States.[15]

BSI has continued to operate under its own charter as a separate banking entity, and is supervised by a Board of Directors. The Board of Directors consists of a Managing Director, one person from among the BSI staff, and five other recommended individuals. The members of the Board of Directors are elected for three-year terms and may be reelected. The Managing Director holds the highest administrative and executive position and has authority to determine bank policies.[16] The Board of Directors is responsible for, and presides over, the daily activities of BSI.

According to the district court, two governmental entities regulate BSI: the General Assembly of Banks and the High Council of Banks. The General Assembly consists of Iranian government officials [17]

be accomplished because of "the totalitarian nature of the regime and the limited ability of this or any other non-governmental plaintiff to assure the safety of witnesses...." (Appellant's Br. at 16–17). Flatow does not elaborate on this claim or provide any examples of efforts he has made to show day-to-day control that have been thwarted by Iran. The discovery assistance he requested from the district court was denied because it was not pertinent to the sole subject of discovery: whether Iran exerts control over BSI. For further discussion of this issue, *see infra*, at III.B.

13. According to the district court, BSI's operations are governed by its Articles of Association, established in 1982. The stated objective of the bank is "to execute banking operations and servicies [sic] within the country and abroad." Article 1 of the Articles of Association states, "Except in those cases which have clearly been stipulated in the law and regulatio [sic], BANK SADERAT IRAN is not subject to general rules and regulations related to the ministries and government-affiliated companies and organizations."

14. On June 7, 1979, the Iranian government nationalized all Iranian banks.

15. BSI conducts the operations of its New York office pursuant to a license issued under the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701–02.

16. According to the affidavit of Mohammedreza Moghadasi, the current Managing Director of BSI, his powers include, but are not limited to: (1) representing the bank before all real or judiciary persons; (2) hiring, terminating, or promoting banking staff and employees; (3) opening accounts with other banks and operating those accounts on behalf of BSI; (4) executing contracts and renting facilities; (5) filing and dismissing civil actions on behalf of BSI; and (6) all other powers specified in Article 20 of the Articles of Association.

17. Specifically, the official members are the Minister of Economic and Financial Affairs, the Minister of Industries and Mines, the Minister of Commerce, the Minister of Agriculture

and it meets yearly to review the status of banks in Iran. It reviews BSI's annual report, balance sheet, and profit and loss statements. The High Council of Banks [18] has an advisory role to the General Assembly of Banks and meets weekly. The High Council proposes candidates for Iranian banks' boards of directors, including BSI's Board of Directors, and assists in the preparation of regulations, budgets, and reports on banking operations in Iran. The High Council does not involve itself in the day-to-day operations of BSI. The district court credited BSI's assertion that the General Assembly of Banks and the High Council of Banks perform broad policy-making functions like those of the United States Federal Reserve.

Finally, the district court noted the affidavit of Mohammedreza Moghadasi, the Managing Director of BSI, in which Moghadasi asserts that members of the BSI Board of Directors are all career bankers with extensive experience in finance and banking. He also states that the Board of Directors appoints officers of the bank and oversees the bank's affairs, which include accepting deposits, loan and investment activities, letters of credit, credit collections, and payment order transactions.

■ Flatow argues that Iran's ownership of BSI's capital precludes BSI from being considered a separate juridical entity under *Bancec*. However, Flatow is incorrect in his belief that this fact alone is determinative. As the Supreme Court recognized in *Bancec*, an entity fully owned by a foreign state is still accorded the presumption that it is a separate juridical entity. *See Bancec*, 462 U.S. at 624, 103 S.Ct. 2591 (recognizing that government "appropriations to provide capital or to cover losses" do not prevent a typical government instrumentality from being considered a separate juridical entity); *see also Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 782 F.2d 377, 380 (2d Cir.1986) (concluding that although Banco Nacional was entirely owned by Cuba it was a separate entity from Cuba); *Pravin Banker Assoc. v. Banco Popular del Peru*, 9 F.Supp.2d 300, 306 (S.D.N.Y. 1998) (analogizing Peru's full ownership of the bank "to the conduct of a majority shareholder" and concluding that state ownership cannot be the sole basis for ignoring the corporate form, especially where the entity was not established in an attempt to shield the assets of Peru). We reject Flatow's argument that the Iranian Constitution and the nationalization of Iranian banks are sufficient to overcome the *Bancec* presumption, and accordingly, we affirm the decision of the district court.

■ We also affirm the district court's determination that Iran's limited supervision, through the role of the General Assembly of Banks and the High Council, does not constitute day-to-day control sufficient to overcome the separate juridical entity presumption. The government involvement must rise to a higher level. *See, e.g., McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351–52 (D.C.Cir.1995) (concluding that the separate juridical entity presumption was overcome where Iran controlled routine

---

and Rural Development, the Minister of Housing and Town Planning, and the Director of Plan and Budget Organization.

**18.** This Council is composed of the Director General of the Central Bank of Iran, the General Manager of Bank Melli Iran, a representative of the Ministry of Plan and Budget Organization, a representative of the Ministry of Economic and Financial Affairs, a representative of the Ministry of Housing and Town Planning, a representative of the Ministry of Agriculture and Rural Development, a representative of the Ministry of Commerce, and a representative of the Ministry of Industries.

business decisions, such as declaring and paying dividends and honoring contracts); *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 616 F.Supp. 660, 666 (W.D.Mich.1985) (finding day-to-day control where the government required that all checks above a certain amount be signed by a government official, governmental agency was required to approve all invoices for shipment, and the government generally exercised direct control over the instrumentality's operations). The daily affairs of BSI and its 3000 branch offices are overseen by the Board of Directors, consisting of career bankers, the Managing Director, and other bank officers. On this record, the level of economic control exercised by the Iranian government over BSI appears quite limited, and we agree with the district court that Flatow has not shown that the Iranian government is the real beneficiary of BSI's banking operations.

### B. Protective Order and Discovery Request

Even though the district court concluded on May 22, 2000, that Iran did not exercise sufficient control over BSI to overcome the *Bancec* presumption, the court allowed the parties to pursue discovery on the matter until July 31, 2000. The sole subject of discovery was: whether the Islamic Republic of Iran exerts sufficient control over BSI for the bank's assets to be attached in satisfaction of the judgment against Iran.

On June 22, 2000, Flatow submitted two motions for the district court to issue a Request for International Judicial Assistance pursuant to the Hague Convention on the Taking of Evidence Abroad.[19] Flatow sought to depose Abolhassan Bani Sadr, who was president of Iran from 1979 to 1981 and now resides in France, and

Ahmad Behbahani, who represents himself to be the former director of terrorist operations for Iran and now lives in Turkey. BSI opposed the motions and sought a protective order from the court to prohibit the depositions on the ground that they would be an undue burden on and expense for BSI, and because neither Bani Sadr nor Behbahani is competent to testify regarding the subject of discovery.

 The district court granted BSI's protective order and denied Flatow's request for international assistance in deposing the former Iranian leaders. The court first concluded that the burden and expense of obtaining discovery outweighed Flatow's interest in deposing Bani Sadr, who the district court found has no firsthand knowledge of whether Iran exerts day-to-day control over BSI. Bani Sadr has been exiled from Iran since 1981 and has never been a director or officer of BSI. Secondly, the court explained that Flatow's efforts to depose Behbahani are prohibited by his failure to demonstrate that Turkey, where Behbahani resides, has signed the Hague Convention. Additionally, the information Flatow sought to obtain from Behbahani was outside the scope of the sole issue of discovery. Flatow objects to both of these determinations and makes essentially the same arguments to this court that he made to the district court.

We affirm the district court's decision to grant a protective order under Fed. R.Civ.P. 26(c) that the depositions of Bani Sadr and Behbahani may not proceed. Under that provision, the district court may grant a protective order for "good cause shown," *see* Fed.R.Civ.P. 26(c). In reaching this decision, the court has "extensive control" over the discovery process. *United States v. Columbia Broad.*

---

19. The Hague Convention of March 18, 1970, On the Taking of Evidence Abroad In Civil or Commercial Matters provides procedures for taking discovery in foreign countries.

*Sys., Inc.,* 666 F.2d 364, 369 (9th Cir.1982). Flatow has failed to demonstrate that either of these individuals is remotely competent to testify regarding whether the Islamic Republic of Iran exerts sufficient control over BSI for the bank's assets to be attached in satisfaction of his judgment against Iran.

## IV. CONCLUSION

This panel joins other courts in expressing regret that its holding forestalls the Flatow family's efforts to execute their judgment against Iran. *See, e.g., Flatow v. Islamic Republic of Iran,* 74 F.Supp.2d at 25–26; *Flatow v. Islamic Republic of Iran,* 76 F.Supp.2d at 28. There has, however, been substantial payment of damages through the legislation passed by the United States Congress. *See supra,* note 6. The government of Iran should pay its debt to the Flatow family, but BSI cannot be held liable for this debt. We follow the clear path set out by the applicable case law. Thus, we AFFIRM the district court.