Opinion by Judge TALLMAN; Concurrence by Judge BEA; Dissent by Judge GOULD.
OPINION
TALLMAN, Circuit Judge,
announcing the judgment of the Court:
In this case we consider what acts may be attributed to a foreign state in applying the commercial activity exception to immunity under the Foreign Sovereign Immunities Act.
Carol Sachs sued Austrian-owned OBB Personenverkehr after sustaining personal injuries as a result of her attempt to board a moving train in Innsbruck. The district court ruled that the commercial activity exception to the Foreign Sovereign Immunities Act did not apply and dismissed Sachs’s suit for lack of subject matter jurisdiction. Sachs appeals the district court’s order. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
I
In March 2007, Sachs purchased a Eu-rail pass in California from Rail Pass Experts, a company based in Massachusetts. A Eurail pass is a train ticket that allows passage on various railways of the Eurail Group, an association of thirty-one European railway transportation providers. Sachs’s pass permitted travel in Austria and the Czech Republic. In April Sachs traveled to Austria, where she intended to originate her journey, and there purchased a sleeper upgrade to her ticket at a local train station. A few days later, on April 27, 2007, Sachs arrived at the Innsbruck train station and attempted to board a moving train. She fell to the tracks through a gap in the platform and suffered injuries that ultimately required the amputation of both legs above the knee.
OBB Personenverkehr (“OBB”) is the Austrian national railway. OBB Holding Group (“Holding Group”) owns 100% of OBB’s stock. The Republic of Austria created Holding Group under Austrian railway law, and the Republic’s Federal Ministry of Transport, Innovation and Technology is the sole shareholder of Holding Group. OBB is not required to pay income or corporate tax and, through its parent Holding Group, forwards all profits to the Austrian government.
The Eurail Group (“Eurail”) is an association organized under Luxembourg law. OBB and thirty other European railways own Eurail. Eurail is a distinct legal entity and employs its own management and employees. Eurail is tasked with, among other things, the marketing and sale of Eurail passes.
Sachs filed a complaint in the Northern District of California against the Republic of Austria, Holding Group, and OBB. She asserted claims of negligence, design de *1023 feet, failure to warn, and breach of the implied warranties of merchantability and fitness, premising federal jurisdiction on diversity. Holding Group was not served and is not a party to this case. The Republic of Austria and OBB moved to dismiss based on lack of subject matter jurisdiction. Sachs did not oppose Austria’s motion and the district court granted it. The district court at first did not rule on OBB’s motion, instead calling for supplemental briefing on whether the actions of Rail Pass Experts could be imputed to OBB. On January 28, 2011, the district court granted OBB’s motion to dismiss after concluding that OBB was immune from suit. This appeal followed.
II
The “sole basis” by which courts in the United States may obtain jurisdiction over foreign states is the Foreign Sovereign Immunities Act (“FSIA”), 28 U.S.C. § 1602 et seq. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Under the FSIA, foreign states are presumptively immune from suit in federal and state courts, subject to a number of exceptions. Embassy of the Arab Republic of Egypt v. Lasheen, 603 F.3d 1166, 1169 (9th Cir.2010); see also 28 U.S.C. § 1604. These exceptions are found in 28 U.S.C. § 1605 and § 1607, Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), and “focus on actions taken by or against a foreign sovereign.” In re Republic of Phil., 309 F.3d 1143, 1150 (9th Cir.2002). The exceptions include actions in which the foreign state has waived its immunity, 28 U.S.C. § 1605(a)(1), and actions involving the foreign state’s successor interest in property located in the United States, id. § 1605(a)(4). “The two most commonly invoked exceptions to immunity, however, are those for commercial acts and for tortious acts.” Wolf v. Fed. Republic of Ger., 95 F.3d 536, 541 (7th Cir.1996) (citing 28 U.S.C. § 1605(a)(2) & (a)(5)).[1]
Sachs, as the party bringing suit against a foreign state, must offer evidence that an exception to immunity applies. See Joseph v. Office of Consulate Gen. of Nigeria, 830 F.2d 1018, 1021 (9th Cir.1987). If she does so, OBB would bear the burden of establishing by a preponderance of the evidence that the exception does not apply. See id. We review de novo a district court’s determination regarding sovereign immunity under the FSIA. Corzo v. Banco Cent. de Reserva del Peru, 243 F.3d 519, 522 (9th Cir.2001).
III
The parties agree that the only exception relevant to this appeal is the commercial activity exception, which deprives for *1024 eign sovereigns of immunity in any case “in which the action is based upon a commercial activity carried on in the United States by the foreign state.” 28 U.S.C. § 1605(a)(2). There is no dispute that OBB, as an “agency or instrumentality” of Austria, id. § 1603(a), constitutes a “foreign state” for the purposes of the FSIA.
Sachs’s argument for jurisdiction is scattershot but is premised upon the fact that the sale of the Eurail pass by Rail Pass Experts is a commercial activity that should be imputed to OBB. Both parties agree that the purchase of the Eurail pass is the only commercial activity within the United States relevant to this case. But OBB denies that it was commercial activity by the state because any connection between Rah Pass Experts and OBB is so attenuated.
A.
We previously grappled with the question of which acts could be attributed to a foreign state under the FSIA in Doe v. Holy See, 557 F.3d 1066 (9th Cir.2009) (per curiam), cert. denied, — U.S. —, 130 S.Ct. 3497, 177 L.Ed.2d 1089 (2010). John V. Doe, the plaintiff in that case, brought vicarious liability claims, among others, against the Holy See for the actions of its subordinates, including the Archdiocese of Portland, Oregon (Archdiocese), the Catholic Bishop of Chicago (Bishop), and the Order of the Friar Servants (Order). Doe alleged that Father Ronan, a member of the Order and priest in the Archdiocese, had sexually assaulted him when he was a teenager. Id. at 1069. The district court held that the commercial activity exception to immunity did not apply but that the tortious act exception did, thus granting it jurisdiction. Id. at 1071. The Holy See countered that it retained immunity from suit because the acts of the Archdiocese, the Bishop, and the Order could not properly be imputed to it for jurisdiction purposes. Id. at 1076.
On appeal, we recognized that “in applying the jurisdictional provisions of the FSIA, courts will routinely have to decide whether a particular individual or corporation is an agent of a foreign state.” Id. at 1079. We looked for guidance in First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). In Bancec, the Supreme Court considered the inverse situation from the one we faced in Holy See — that is, when the actions of a foreign state could be attributed to its subordinate. Id. at 620, 103 S.Ct. 2591. The Cuban government had established Bancec as an official credit union, owned all of its stock, and supplied its capital. Id. at 613-14, 103 S.Ct. 2591. In 1960 Cuba nationalized all U.S. property in the country, including banks. Citibank had previously issued Bancec a letter of credit related to a sugar sale but, when Bancec presented the letter for payment, Citibank paid the amount sought less the value of its expropriated Cuban branches. Id. at 614-15,103 S.Ct. 2591. Bancec then brought suit in federal district court seeking to collect on the full value of the letter of credit and Citibank counterclaimed. Id. at 615,103 S.Ct. 2591.
The Court considered whether Bancec was liable on Citibank’s expropriation claim; jurisdiction was not at issue in the case. Id. at 619-21, 103 S.Ct. 2591. As we noted in Holy See, the Supreme Court “recognized a presumption of ‘separate juridical status’ ” for subordinates of foreign states. 557 F.3d at 1077 (quoting Bancec, 462 U.S. at 624, 103 S.Ct. 2591) (brackets omitted). The Court clarified that this presumption will be negated only (1) “where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created” or (2) *1025 where recognizing the presumption “would work fraud or injustice.” Bancec, 462 U.S. at 629, 103 S.Ct. 2591 (internal quotation marks omitted). Relying on the second, equitable prong, the Court held Bancec liable because recognizing its separate status would permit Cuba, the true beneficiary behind the by-then-defunct bank, to enforce the bank’s claim against Citibank while simultaneously avoiding jurisdiction on the creditor’s counterclaim against the Cuban government. Id. at 630-32, 103 S.Ct. 2591.
We expressly adopted this analysis in Holy See and extended it to the jurisdiction phase of the FSIA, joining the Fifth and D.C. Circuits in so doing. 557 F.3d at 1078-79 (“Applying Bancec’s presumption — as well as the standard for overcoming that presumption — at the outset of a suit as well as at the merits phase makes good sense.”). Turning to the facts of the case, we concluded that Doe’s allegations were not sufficient under the Bancec standard to overcome the presumption of the Holy See’s separate juridical status. Id. at 1079. Doe did not allege the required “day-to-day, routine involvement” by the Holy See in its subordinates’ operations to establish the existence of a principal— agent relationship. Id. (citing Flatow v. Islamic Republic of Iran, 308 F.3d 1065 (9th Cir.2002)). The fact that the Holy See created those entities and even regulated them was not enough. Id. at 1079-80. Nor was jurisdiction proper under the equitable prong. “Doe ha[d] not alleged that the Holy See ... inappropriately used the separate status of the corporations to its own benefit, as in Bancec, or that the Holy See created the corporations for the purpose of evading liability for its own wrongs.” Id. at 1080.
The lay of the land after Holy See is thus considerably clearer. In determining “which of the acts alleged in the complaint may legitimately be attributed to the [foreign state] for purposes of establishing jurisdiction [under the FSIA],” we first must recognize that a foreign state has a presumption of separate juridical status. Id. at 1076, 1079. That presumption is overcome only if the complaint alleges “day-to-day, routine involvement” of the foreign state in the individual or corporation’s affairs, see id. at 1079, or if maintaining the presumption would “work fraud or injustice,” see id. at 1078-79.
B.
Sachs’s allegations do not withstand this scrutiny. Rail Pass Experts’ sale of the Eurail pass cannot, under Holy See, be imputed to OBB. Like John V. Doe, Sachs “does not allege day-to-day, routine involvement of’ OBB in Eurail Group, much less Rail Pass Experts. See id. at 1079. She alleges that Eurail Group is owned by and represents OBB and that Rail Pass Experts was in turn an agent for Eurail Group. But these facts fall far short of what the Bancec standard requires. In Flatow v. Islamic Republic of Iran, for example, we applied the Bancec standard at the merits phase to determine whether the actions of a bank could be imputed to Iran. 308 F.3d at 1069, 1071. Despite the fact that Iran nationalized and fully owned the bank, as well as proposed candidates for its board of directors, we held that these allegations were insufficient to negate the presumption of separate juridical status. Id. at 1071-74.
The best Sachs can allege is that OBB, as a part-owner along with thirty other owners, wielded some degree of control over Eurail Group and was aware that Eurail Group used U.S. sales agents like Rail Pass Experts. But even these facts are not nearly enough under Holy See. Sachs has nowhere alleged that OBB was involved in Rail Pass Experts’ routine, *1026 day-to-day operations, see Holy See, 557 F.3d at 1079; in fact, it is not clear that OBB was even aware that Rail Pass Experts existed. Nor is it alleged that OBB was involved in Eurail Group’s affairs to this high degree. Eurail Group has its own independent management. The connection between OBB and Rail Pass Experts is not close enough under the first prong of the Bancec standard to overcome the presumption of separate juridical status and impute the sale of the Eurail pass to OBB.
Nor would granting immunity to OBB “work fraud or injustice,” Bancec’s second method for overcoming the presumption of separate juridical status. See id. at 1077-78 (quoting Bancec, 462 U.S. at 629, 103 S.Ct. 2591). It is undisputed that OBB itself engages in no commercial activity in the United States, presumably in part to retain immunity from suit in American courts. Any injustice that results is no greater than in the mine-run of cases— jurisdiction over a foreign state is, after all, ordinarily not available. See Verlinden, 461 U.S. at 488, 103 S.Ct. 1962. And this case is a far cry from Bancec, where Cuba, the real beneficiary behind a defunct bank, wanted to collect on the bank’s claim against Citibank but deny jurisdiction on Citibank’s counterclaim against the Cuban government. Bancec, 462 U.S. at 631-33, 103 S.Ct. 2591; see also Flatow, 308 F.3d at 1072 (“[UJnlike in Bancec, [Bank Saderat Iran] is not attempting to use a United States court to recover on a claim while at the same time trying to avoid being the subject of an adversary proceeding.”). There is no similar sleight of hand by OBB that would trump the presumption of its separate juridical status. See Holy See, 557 F.3d at 1079. OBB thus engaged in no commercial activity within the United States that would strip it of its immunity to suit.
C.
The concurrence and dissent argue that the above precedent is not applicable to our ease because in Holy See we considered the tortious act exception to immunity rather than the commercial activity exception. This distinction was not meaningful to our analysis in Holy See, nor should it be here.
Our opinion in Holy See contains expansive language regarding its applicability to FSIA cases. After deciding that the actions of the Archdiocese, the Order, and the Bishop were not attributable to the Holy See, we concluded that the plaintiff had “therefore not alleged sufficient facts to demonstrate that any exception to sovereign immunity applies to that cause of action.” Holy See, 557 F.3d at 1080 (emphasis added). We also noted that “in applying the jurisdictional provisions of the FSIA, courts will routinely have to decide whether a particular individual or corporation is an agent of a foreign state,” and that “Bancec provides a workable standard for deciding this question.” Id. at 1079. Nowhere did we indicate that this holding should be cabined to the tortious act exception and indeed such an interpretation would fly in the face of a plain reading of this language.
The question of which acts of a corporation or an individual may be imputed to the foreign state is prehminary to consideration of individual exceptions to immunity, as we have previously recognized: “Before turning to the question of which, if any, of the FSIA’s exceptions to immunity apply, we must determine which of the acts alleged in the complaint may legitimately be attributed to the Holy See for purposes of establishing jurisdiction.” Id. at 1076. There is nothing ambiguous in this holding. If we had wanted to restrict our analysis to the tortious act exception *1027 alone, we would have done so explicitly instead of using such sweeping language.
Nor does any of the precedent we cited in Holy See evince its exclusivity to the tortious act exception; if anything the caselaw suggests the opposite. Holy See borrowed its attribution standard directly from Bancec. Id. at 1079-80. But the Supreme Court in Bancec was not concerned with amenability to suit — its analysis focused on what acts could be imputed to the state for purposes of liability, which Holy See extended to jurisdiction, id. at 1077-78 — so there is no reason why its standard would apply to one exception to immunity but not the others.
Most tellingly, in Holy See we expressly aligned ourselves with two other circuits that had extended this same Bancec analysis to the jurisdiction phase and that did so under the commercial activity exception. Id. at 1078; see also Transamerica Leasing, Inc. v. La Republica de Venez., 200 F.3d 843, 847-48 (D.C.Cir.2000); Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 533-36 (5th Cir.1992). That Holy See involved the tortious act exception did not seem to matter when we relied on these cases for support in adopting the Bancec standard for the FSIA’s jurisdiction phase. Holy See, 557 F.3d at 1078 (“The Supreme Court in Bancec did not have the opportunity to consider whether the actions of a corporation may be attributed to the sovereign ... for purposes of determining whether jurisdiction over that sovereign exists. We have not previously addressed that question either. At least two other circuits, however, faced with such a scenario, have applied Bancec’s substantive corporate law principles in determining whether jurisdiction exists under the FSIA.” (internal footnote omitted and italics removed)). By relying on two circuits that applied Bancec in the context of the commercial activity exception in a tortious act exception case, Holy See stands for the proposition, at least implicitly, that what immunity exception may or may not apply makes no difference to which actions of a corporation can be attributed to the sovereign.
Out-of-circuit caselaw confirms that the Bancec standard is applicable to the FSIA’s jurisdictional provisions regardless of which exception is at issue. The standard is in no way unique to tort cases. Both Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 847-54, and Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d at 533-36, extended Bancec to the jurisdiction phase in cases involving the commercial activity exception. Likewise the Northern District of Illinois, citing our decision in Holy See, applied Bancec to this provision. In re Potash Antitrust Litig., 686 F.Supp.2d 816, 821-22 (N.D.I11.2010). Another district court decision extended Bancec to a case involving § 1605(a)(3), the “takings” exception, an entirely different exception to immunity. Freund v. Republic of Fr., 592 F.Supp.2d 540, 558-59 (S.D.N.Y.2008). The dissent provides no case, in fact, that suggests that Bancec might apply to one of the FSIA’s jurisdictional provisions but not to all. The absence of such authority is striking.
It is true, as the dissent notes, that we did not specifically consider the commercial activity exception to immunity in Holy See, 557 F.3d at 1076, but it is unclear why this fact should make a difference in the present case. Our decision in Holy See viewed the question of which exception to immunity might apply as totally separate from the issue of which acts were attributable to the foreign state. The structure of the opinion supports this interpretation. The opinion has four sub-headings in its “Analysis” section. The first two discuss the standard of review and jurisdiction *1028 over the appeal. The third is entitled “Determining Which Acts May Be Attributed to the Holy See for Jurisdictional Purposes,” and in a fourth we finally address the tortious act exception. If the standard for determining which acts of a corporation were attributable to the sovereign were unique to the tortious act exception, it would have made sense to analyze them together. Yet in our discussion of agency/attribution we did not once mention the tortious act exception of § 1605(a)(5)— or any other exception for that matter— which would be odd if we were anchoring our analysis to the text of that statutory subsection alone.
Even if Holy See were only applicable to certain, but not all, of the FSIA’s exceptions to immunity, the commercial activity and tortious act exceptions are closely tethered by the statutory text. “The tortious activity exception provides jurisdiction over tort actions not encompassed in the commercial activity exception ‘in which money damages are sought against a foreign state for ... damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state.’ ” Joseph, 830 F.2d at 1025 (quoting § 1605(a)(5)) (alteration in original).
There is nothing in our opinion in Holy See to suggest that we meant to restrict its applicability to the tortious act exception. Even assuming the decision is not directly controlling, given the opinion’s language, precedent, and structure there is no intelligible reason why we should not apply it in a closely analogous case. The concurrence and dissent do not even attempt to explain by what limiting factor Bancec would apply to the tortious act exception and not the commercial activity exception.
D.
Even were we to accept the suggestion that Holy See is not controlling on this case, we reject Sachs’s and the dissent’s contention that Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China, 822 F.2d 11 (2d Cir.1987), and Kirkham v. Société Air France, 429 F.3d 288 (D.C.Cir.2005), elucidate our task. In each of these cases the court held that the commercial activity exception applied and that the foreign state was not immune from suit. But agency was undisputed in both Kirkham and Barkanic and thus neither squarely tackles the issue before us here: whether the acts of a separate entity may be attributed to the sovereign.
In Barkanic, the decedents purchased tickets for an internal Chinese flight on CAAC, the Chinese state airline, from a U.S. travel agency, which the court stated was “an agent for Pan American.” 822 F.2d at 12. CAAC and Pan Am entered into a bilateral general sales agency agreement whereby CAAC would act as general sales agent for Pan Am in China and Pan Am would act as general sales agent for CAAC in the United States. Id. CAAC maintained offices and employees in New York and operated some flights out of U.S. cities. Id. The decedents’ flight crashed, killing them, and their estates sued the airline. Id. The opinion focused on whether there was a sufficient nexus between the crash and CAAC’s commercial activity within the United States, but the court never explicitly analyzéd what qualified as “commercial activity carried on in the United States by the foreign state.” 28 U.S.C. § 1605(a)(2); see Barkanic, 822 F.2d at 13.
Kirkham involved a woman who injured her foot at Orly Airport in Paris, allegedly due to the negligence of an Air France employee. 429 F.3d at 290. The plaintiff purchased her tickets from a U.S. travel agency; her trip included a flight on Unit *1029 ed Airlines from Washington, D.C., to Paris and, four days later, a flight to Corsica on Air France. Id. The injury occurred at the airport prior to her second flight. Id. Again the court focused solely on whether the claim was based upon her ticket purchase without considering commercial activity, id. at 291-92, in this case because “Air France concede[d] the ticket sale constituted a commercial activity in the United States.” Id. at 293.
The dissent interprets these cases to mean “that where a foreign common carrier, operated by a sovereign entity, purposefully sells tickets for use of the carrier’s services overseas through a domestic sales agent, the ticket sale is commercial activity which may be imputed to the foreign common carrier.” But this conclusion assumes the answer to the question we are tasked with answering: whether Rail Pass Experts is an agent of OBB at all. Agency was undisputed in Barkanic, 822 F.2d at 12, and Kirkham, 429 F.3d at 293, whereas here it is hotly contested. It is not enough to simply note that attributing the ticket sale to the airline went “without dispute between the parties and without suggestion from either the Second Circuit or the D.C. Circuit that to do so was inconsistent with the FSIA’s commercial activity exception.” We do not know why agency was undisputed and we should not speculate. But we cannot allow counsel’s strategic decision to forego contesting agency in Kirkham and Barkanic to foreclose OBB’s ability to do so here.
IV
It is the judgment of this Court that the district court correctly dismissed this case for lack of subject matter jurisdiction.
AFFIRMED.

. The commercial activity exception withdraws immunity from a foreign state in any case
in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
28 U.S.C. § 1605(a)(2). The tortious act exception, for its part, deprives a foreign state of immunity in cases
not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.
Id. § 1605(a)(5).