OPINION
GOULD, Circuit Judge:
We must decide whether a resident of the United States has a domestic forum in which to bring a claim against a foreign common carrier, operated by a foreign sovereign entity, that sells tickets through a third-party agent or subagent in the United States. Carol P. Sachs filed a- complaint against OBB Personenverkehr AG (OBB) in the United States District Court for the Northern District of California. Sachs sought damages for traumatic injuries that she sustained while trying to board an OBB train in Innsbruck, Austria.
The district court granted OBB’s motion to dismiss for lack of subject-matter jurisdiction, concluding that OBB, as an instrumentality of the Republic of Austria, was immune from suit under the Foreign Sovereign Immunities Act of 1976 (FSIA). On appeal, Sachs argues that under the first clause of the FSIA’s commercial-activity exception, the district court has subject-matter jurisdiction over her claims. We agree. A foreign-state owned common carrier, such as a railway or airline, engages in commercial activity in the United States when it sells tickets in the United States through a travel agent regardless of whether the travel agent is a direct agent or subagent of the common carrier. Under the FSIA, federal courts of the United States will have subject-matter jurisdiction over actions against a foreign sovereign common carrier that engages in commercial activity of this' kind as long as the plaintiffs claims are based upon that activity.

[1]

OBB Personenverkehr AG is a separate legal entity wholly owned by OBB Holding Group, a joint-stock company created by the Republic of Austria. OBB Holding Group is wholly owned by the Austrian Federal Ministry of Transport, Innovation, ánd Technology. OBB’s main function is to operate passenger rail service within Austria. Like many of its counterparts in other European countries, OBB is a member of the Eurail Group, which is ah association organized under Luxemburg law. According to OBB, Eurail Group is responsible for marketing and selling rail passes. Eurail passes are marketed to non-European residents, as they cannot be used, by residents of Europe and nearby countries.
In early March 2007, Sachs purchased a four-day Eurail pass from the Rail Pass Experts (RPE) for travel in Austria and the Czech Republic. RPE is located in Massachusetts, but Sachs bought the Eu-rail pass online through the RPE website. Sachs’s Eurail pass listed various disclaimers, including that “the issuing office is merely the intermediary of the carriers in Europe and assumes no liability resulting from the transport.” The Eurail pass'also stated that it is “non-transferable and only *588 valid upon presentation of a passport or a valid travel document replacing the passport.”
In late April 2007, Sachs arrived in Innsbruck, Austria, and presented her Eurail pass to OBB to purchase a couchette reservation for her trip from Innsbruck to Prague. Although Sachs would have been able to board the train to sit in an unassigned seat with the Eurail pass that she bought from RPE, she paid the 30.90 fee to upgrade her pass and reserve a couchette bed. The Eurail pass required customers to pay separately for upgrades of this kind.
When Sachs tried to board the train, she fell between the tracks. Her legs were crushed by the moving train. As a result of these injuries, both of Sachs’s legs were amputated above the knee. Sachs alleges that OBB caused her injuries by negligently moving the train while she attempted to board. OBB disputes this allegation, claiming that the train was already moving when Sachs tried to board.
Sachs filed suit against OBB in the United States District Court for the Northern District of California.[1] Her complaint asserts claims for negligence; strict liability for, a design defect; strict liability for failure to warn about a design defect; breach of implied warranty of merchantability; and breach of implied warranty of fitness. To support these claims, Sachs alleges (a) that she purchased the Eurail pass through OBB’s agent Eurail and the American-based company RPE; (b) that through the Eurail pass OBB agreed to provide railway transportation to Sachs during her April 2007 visit to Austria; and (c) that OBB, as a common carrier, owed her a duty of “utmost care.”
OBB filed a motion to dismiss on June 21, 2010, arguing that it was entitled to sovereign immunity under the FSIA. In the alternative, OBB also argued that Sachs’s complaint should be dismissed for forum, non conveniens, lack of personal jurisdiction, and international comity. After a hearing and supplemental briefing on the motion, the district court' granted OBB’s motion to dismiss for lack of subject-matter jurisdiction on foreign-sovereign-immunity grounds. Sachs v. Republic of Austria, No. C 08-1840 VRW, 2011 WL 816854, at *4 (N.D.Cal. Jan. 28, 2011) (unpublished). The district court concluded that Sachs had not shown a connection between OBB and RPE sufficient to create a principal-agent relationship. As a result, the district court found that RPE’s commercial activity in the United States could not be imputed to OBB. Sachs timely appealed.
A divided three judge panel of this court affirmed. Sachs v. Republic of Austria, 695 F.3d 1021, 1029 (9th Cir.2012). The majority of judges agreed on result but not reasoning. Relying on our previous decision in Doe v. Holy See, 557 F.3d 1066 (9th Cir.2009) (per curiam), the majority opinion concluded that RPE’s sale of the Eu-rail pass could not be imputed to OBB for purposes of establishing jurisdiction under the FSIA’s commercial-activity exception. Sachs, 695 F.3d at 1025-26. The concurrence agreed that the district court properly dismissed the case for lack of subject-matter jurisdiction, but it argued that Holy See was inapposite because that case addressed a different exception under the FSIA. Instead, the concurrence argued that Sachs’s claim failed under Sun v. Taiwan, 201 F.3d 1105 (9th Cir.2000), because *589 Sachs did not allege facts sufficient to show that her claims were “based upon” the sale of the Eurail pass in the United States. Sachs, 695 F.3d at 1029-30 (quoting 28 U.S.C. § 1605(a)(2)). The dissent explained that both Holy See and Sun were distinguishable from Sachs’s case and that the plain language of the FSIA permits jurisdiction over OBB. Id. at 1032-33.
We ordered rehearing en banc to clarify whether the first clause of the FSIA commercial-activity exception applies to a foreign sovereign when a person purchases a ticket in the United States from a travel agency for passage on a commercial common carrier owned by that foreign state.
II
We review de novo the district court’s determination of immunity under the FSIA. Embassy of the Arab Republic of Egypt v. Lasheen, 603 F.3d 1166, 1170 (9th Cir.2010). A defendant asserting foreign sovereign immunity “may make either a facial or factual challenge to the district court’s subject matter jurisdiction.” Terenkian v. Republic of Iraq, 694 F.3d 1122, 1131 (9th Cir.2012), cert. denied, — U.S. -, 134 S.Ct. 64, 187 L.Ed.2d 27 (2013). A facial challenge argues only that the facts as alleged in the complaint are insufficient to state a claim. Id. A factual challenge disputes the truth of the allegations that would otherwise be sufficient to invoke federal jurisdiction. Id.
OBB’s challenge is factual. OBB submitted documentary evidence and a declaration to prove OBB’s status as an agency or instrumentality of the Austrian government and to dispute the truth of Sachs’s allegations that RPE sold the ticket as an authorized agent of OBB. Sachs submitted her own declaration and evidence to support her claim of jurisdiction under the FSIA’s commercial-activity exception. When the district court relies on such evidence for its decision, we generally treat the jurisdictional attack as factual. See Holy See, 557 F.3d at 1073. For such a factual challenge, we must determine (1) whether Sachs has carried her burden to prove, by offering evidence, that the commercial-activity exception to foreign sovereign immunities applies and (2) whether OBB has carried its burden to prove, by showing a preponderance of evidence, that the exception is not applicable. See Terenkian, 694 F.3d at 1131-32.
Ill
The doctrine of foreign sovereign immunity has its roots in the common law, tracing back to the Supreme Court’s decision in Schooner Exchange v. McFaddon, 11 U.S. 116, 7 Cranch 116, 3 L.Ed. 287 (1812), which extended “virtually absolute immunity to foreign sovereigns as ‘a matter of grace and comity.’ ” Somantar v. Yousuf, 560 U.S. 305, 311, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) (quoting Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). After Schooner Exchange, federal courts routinely deferred to the State Department on whether to assume jurisdiction over an action against a foreign sovereign or its instrumentality. Republic of Austria v. Altmann, 541 U.S. 677, 689, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004).[2] In 1952, the State Department adopted a “restrictive” theory of sovereign immunity. Samantar, 560 U.S. at 312, 130 S.Ct. 2278. *590 The restrictive theory of sovereign immunity recognizes that sovereigns are immune “with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis).” Altmann, 541 U.S. at 690, 124 S.Ct. 2240 (internal quotation marks omitted). This shift was based on the philosophy that where foreign sovereigns engage in commercial dealings there is “a much smaller risk of affronting their sovereignty.” Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 703, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (plurality).
In 1976, Congress codified the State Department’s restrictive theory of sovereign immunity in the FSIA, which established a comprehensive “set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities” and shifted the primary responsibility for determining immunity to the federal courts. Altmann, 541 U.S. at 691, 124 S.Ct. 2240 (quoting Verlinden B.V., 461 U.S. at 488, 103 S.Ct. 1962). The FSIA establishes a presumption of immunity for foreign states but carves out specified exceptions to that grant of immunity. Id. The FSIA exceptions are “the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts.” Peterson, 627 F.3d at 1122 (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989)).
The exception relevant to this appeal is the first clause of the commercial-activity provision, which provides that a foreign state is amenable to suit where the plaintiffs action is “based upon a commercial activity carried on in the United States by the foreign state.” 28 U.S.C. § 1605(a)(2).[3] This clause has two parts: (1) the foreign sovereign must have carried on commercial activity within the United States; and (2) the claim must be based upon that activity.
As for the first part, commercial activity occurs when a foreign state acts as a private player within the market or exercises powers that can also be exercised by private citizens. Terenkian, 694 F.3d at 1132. Commercial activity can be “either a regular course of commercial conduct or a particular commercial transaction or act.” Id. (quoting 28 U.S.C. § 1603(d)). “In determining whether an act or activity is commercial, we must look to its nature, not its purpose.” Siderman de Blake v. Republic of Arg., 965 F.2d 699, 708 (9th Cir.1992). To be “ ‘carried on in the United States’” there must be “substantial contact” between the commercial act and this country. Terenkian, 694 F.3d at 1132 (quoting 28 U.S.C. § 1603(e)).
As for the second part, “based upon” means “those elements of a claim that, if proven, would entitle a plaintiff to relief.” Id. (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 357, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993)). That is, the commercial activity that occurs within the United States must be connected with the conduct that gives rise to the plaintiffs cause of action. Id. at 1132-33; see also Am. W. Airlines, Inc., v. GPA Grp. Ltd., 877 F.2d 793, 796 (9th Cir.1989).
IV
Two main issues are raised on appeal: (1) whether the sale of the Eurail pass, as *591 the underlying commercial activity,[4] can be imputed to OBB for purposes of establishing that OBB carried on commercial activity in the United States; and, if so, (2) whether Sachs’s claims are “based upon” that commercial activity as required by the commercial-activity exception. The parties agree that OBB is an agency or instrumentality of the Republic of Austria and that it qualifies as a foreign state for purposes of the FSIA. They also agree that the sale of a Eurail pass constitutes a commercial activity under the FSIA. We must first determine if there is a relationship between OBB and RPE sufficient to impute RPE’s commercial act within the United States to OBB. If we conclude such a relationship exists, then we must determine if there is a nexus between Sachs’s claims and the underlying commercial activity sufficient to show that the claims of Sachs are “based upon” the commercial activity.
A
The first clause of the commercial-activity exception gives' United States courts subject-matter jurisdiction, over any case against a foreign state or its instrumentality “in which the action is based upon a commercial activity carried on in the United States by the foreign state.” 28 U.S.C. § 1605(a)(2). To apply this exception to Sachs’s claims against OBB, there must be a sufficient connection between OBB and RPE’s sale of a Eurail pass within the United States to support the conclusion that OBB “carried on” commercial activity within the United States. Id. We conclude that there is.
The plain text of the FSIA indicates that the first clause of the commercial-activity exception encompasses situations in which a foreign state carries on commerce through the acts of an independent agent in the United States. The FSIA defines “commercial activity carried on in the United States by a foreign state” as “commercial activity carried on by such state and having substantial contact with the United States.” Id. § 1603(e). This definition requires two elements to establish that a foreign state carried on commercial activity in the United States: (1) that the foreign state carries on commercial activity and (2) that commercial activity has “substantial contact” with the United States. See Nelson, 507 U.S. at 356, 113 S.Ct. 1471 (establishing that jurisdiction requires a plaintiffs action to be “ ‘based upon’ some ‘commercial activity’ by [a foreign state] that had ‘substantial contact’ with the United States”).
1
The FSIA’s legislative history shows that Congress intended the commercial-activity exception to be read broadly to “include not only a commercial transaction performed and executed in its entirety in the United States, but also a commercial transaction or act having a ‘substantial contact’ with the United States.” H.R.Rep. No. 94-1487, at 17 (1976). Notably, neither the statute nor the legislative history defines how the commercial activity within the United States must be “carried on” but both suggest that “the ‘carried on by’ requirement can be interpreted in light of broad agency principles.” Mar. Inti Nominees Estab *592 lishment v. Republic of Guinea, 693 F.2d 1094, 1105 (D.C.Cir.1983). Under traditional agency principles, the foreign state may engage in commerce in the United States indirectly by acting through its agents or subagents. See Phaneuf v. Republic of Indon., 106 F.3d 302, 307-08 (9th Cir.1997) (establishing that a foreign state can conduct commercial activity through its agents). As long as the agent or sub-agent acts with actual authority, those acts can be imputed to the foreign state. Id.
The Second Circuit and the D.C. Circuit have both applied this principle of imputing the acts of a subagent to a foreign state under the first clause of the commercial-activity exception.[5] Both have applied the commercial-activity exception where the commercial act in the United States was that of a travel agent acting for the foreign sovereign. In Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China (CAAC), the Second Circuit concluded that the first clause of the commercial-activity exception applied to the Chinese airline CAAC based on the sale of a plane ticket in the United States by a third-party agent. 822 F.2d 11, 13 (2d Cir.1987). CAAC had entered into an agreement with Pan American *593 World Airways whereby Pan American would act as a general sales agent for CAAC in the United States. Id. at 12: The tickets in question were not purchased directly through Pan' American but through Pan American’s agent, Vanslycke & Reeside Travel, Inc. Id. Similarly, in Kirkham v. Société Air France, the D.C. Circuit applied the commercial-activity exception to a suit against Air France which was based on the sale of airline tickets through a D.C. travel agency for travel" in France. 429 F.3d 288, 290, 293 (D.C.Cir. 2005). Because Congress passed the FSIA to promote uniformity in the treatment of foreign sovereign immunity, and because we think that Congress intended to permit suit in the United States against foreign sovereign common carriers that sell tickets in the United States through agents, we see no compelling reason to create a split with our sister circuits. See Kelton Arms Condo. Owners Ass’n. v. Homestead Ins. Co., 346 F.3d 1190, 1192 (9th Cir.2003) (When a law is “best applied uniformly, ... we decline to create a circuit split unless there is a compelling reason to do so.”).
Sachs’s claim is no different in substance, for purposes of assessing sovereign immunity, from those analyzed by our sister circuits. Like the travel agents, in Kirkham and Barkanic, RPE is a sub-agent of OBB through Eurail Group. Under traditional theories of agency, RPE’s act. of selling the Eurail pass to Sachs within the United States can be imputed to OBB as the principal. Where a common carrier authorizes a travel intermediary to “issue tickets on its behalf and to collect and hold customer payment, the intermediary acts as the [carrier’s] agent.” Restatement (Third) of Agency § 3.14 cmt. c (2006). Here, Eurail Group markets and sells' rail passes for transportation on OBB’s rail lines, making Eurail Group an agent of OBB. Eurail Group enlists sub-agents, like RPE, to sell and market its passes worldwide. Eurail Group’s use of these subagents establishes a legal relationship between OBB (the principal) and RPE (the subagent): “As to third parties, an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent.” Restatement (Third) of Agency § 3.15 cmt. d (2006). OBB admits as much in describing the relationship between OBB and RPE: “you have the operator, you have a separate legal entity, then you have a marketing arm, then you have a general agent.”
OBB argues that even if an agency relationship exists between it and RPE, RPE still lacked actual authority to sell the Eu-rail pass. We disagree. RPE’s authority to sell the Eurail pass derives from the original authority that OBB granted to Eurail Group to market and sell passes- for transportation on its rail lines. Indeed, Andreas Fuchs, a member of the Board of Management of OBB, conceded in his declaration that this Eurail pass entitled Sachs to board the train in Innsbruck. Moreover, RPE’s actual authority to sell the Eurail pass can be inferred from OBB’s sale of the couchette bed upgrade to.Sachs. Sachs could purchase the couchette upgrade only if she had a valid Eurail pass. Otherwise, she would have been required to purchase an entirely new ticket, not just an upgrade. If RPE had impermissibly sold the Eurail pass to Saphs, OBB would have had no duty to honor the pass. But it did. It cannot now sensibly argue that the sale of that pass by RPE in the United States was unauthorized.[6] Because we conclude -RPE acted *594 as an authorized agent of OBB, we impute RPE’s sale of the Eurail pass in the United States to OBB. See Phaneuf, 106 F.3d at 307-08 (“[A]n agent’s deed which is based on the actual authority of the foreign state constitutes activity ‘of the foreign state.’ ”) (quoting 28 U.S.C. § 1605(a)(2)).
Our case law is not to the contrary. In Holy See, we considered what acts performed by the Holy See’s domestic corporations could be attributed to the Holy See for purposes of the non-commercial torts exception under 28 U.S.C. § 1605(a)(5). Holy See, 557 F.3d at 1076-78. In that context, we found it appropriate to adopt the standard articulated by the Supreme Court in First National City Bank v. Ban-co Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Id. Drawing on common-law corporate principles, the Supreme Court in Bancec adopted and applied a presumption of separate juridical status that can be overcome only when (1) “‘a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created,’ ” or (2) “when recognizing the separate status of a corporation ‘would work fraud or injustice.’” Holy See, 557 F.3d at 1077-78 (quoting Bancec, 462 U.S. at 629, 103 S.Ct. 2591).
Both Bañcec and Holy See are distinguishable because they determined agency in the context of assessing responsibility of corporate affiliates. In contrast, Sachs’s allegations are not based on a corporate relationship between OBB and RPE, but rather on principles of agency. Unlike Cuba and its official bank, Bancec, or the Holy See and its domestic corporations, OBB and RPE are “entirely distinct” entities. See Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 535 (5th Cir.1992). “There is neither common ownership nor any similar legal relationship between these entities.” Id. Thus Ban-cec ’s definition of agency for purposes of piercing the corporate veil is inapposite— “[o]ne cannot pierce a non-existent corporate veil.” Id. The day-today control inquiry under Bancec makes no sense here where the question is “whether a particular type of agency relationship is sufficient under the commercial activity exception.” Dale v. Colagiovanni, 443 F.3d 425, 429 (5th Cir.2006) (distinguishing Bancec from the inquiry of whether an individual agent had authority to bind the foreign state); see also Phaneuf, 106 F.3d at 307 n. 3 (distinguishing the “alter ego” analysis).
OBB contends that common-law principles of agency are inapplicable under the plain language of the FSIA unless the purported agent first meets the statutory definition of “agency or instrumentality of a foreign state” under § 1603(b).[7] Section 1603(b) defines an “agency or instrumentality of a foreign state” as any entity:
(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3) which is neither a citizen of a State or of the United States as defined in section 1332(c) and (e) of this title, nor *595 created under the laws of any third country.
28 U.S.C. § 1603(b). OBB argues that this definition of agency applies throughout the FSIA to limit who could be considered an agent of a foreign state. Under this theory, the court can consider common-law definitions of agency only after the statutory definition of agency is met. OBB contends that because RPE cannot meet the definition of agency under § 1603(b), RPE’s sale of the Eurail pass cannot be imputed to OBB and no jurisdiction exists under the FSIA. We reject this contention.
The plain text of the FSIA does not support OBB’s proposed' framework for determining whether RPE is an agent of OBB. Section 1603(b) defines what type of entity can be considered a foreign state for purposes of claiming sovereign immunity. If an entity cannot show that it meets that definition then it is not entitled to sovereign immunity. Whether an entity meets the definition of an “agency or instrumentality of a foreign state” to claim immunity is a “completely different question” from whether the acts of an agent can be imputed to a foreign state for the purpose of applying the commercial-activity exception. Gates v. Victor Fine Foods, 64 F.3d 1457, 1460 n. 1 (9th Cir.1995) (quoting Hester Int’l Corp. v. Fed. Republic of Nigeria, 879 F.2d 170, 176 n. 5 (5th Cir.1989)).
Common sense also tells us that an agent that carries on commercial activity for a foreign sovereign in the United States does not need to be an agency or instrumentality of a foreign state under § 1603(b). Foreign sovereigns invariably must act through agents, and if they engage in commercial activity in the United States it will necessarily be through an agent, whether that agent is its own employee or a separate company in an agency or subagency relationship.
Further, it is a well-established canon of statutory interpretation that “when a statute covers an issue previously governed by the common law, we interpret the statute with the presumption that Congress intended to retain the substance of the common law.” Samantar, 560 U.S. at 320 n. 13, 130 S.Ct. 2278. To abrogate common-law principles of agency, the FSIA “must speak directly to the question addressed by the common law.” United States v. Bestfoods, 524 U.S. 51, 63, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (quoting United States v. Texas, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993)). Because the FSIA codified our common law of sovereign immunity, Samantar, 560 U.S. at 311, 130 S.Ct. 2278, we begin with the presumption that the statute maintains common-law principles. That Congress defined the term “agency or instrumentality of a foreign state” does not convince us that Congress intended, to displace common-law agency principles under the statute for purposes of assessing commercial activity within the United States.
OBB asks us to read this definition to apply not only to the phrasal term “agency or instrumentality of a foreign state” but also to the individual terms “agency” and “agent.” OBB’s advocated- reading strains the plain language of the FSIA, renders the bulk of the phrase superfluous, and ignores that § 1603(b) defines a singular phrasal term whereili all words are important. Each word within the defined term does not hold the same meaning individually that it has when placed alongside the other terms in the defined phrase. The three elements listed in § 1603(b) define only what constitutes an “agency or instrumentality of a foreign state.” See Samantar, 560 U.S. at 314, 130 S.Ct. 2278 (describing this as a single term). They do not give meaning to the word “agency” or “agent” if used alone. If we were to adopt
*596 OBB’s preferred reading, then § 1605A’s references to an “agent” of a foreign state “acting within the scope of his. or her ... agency” becomes illogical. We will not “construe the statute in a manner that is strained and, at the same time, would render a statutory term superfluous.” Dole Food Co. v. Patrickson, 538 U.S. 468, 476, 77, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003).
The position that OBB advances would negate the possibility of commercial activity by a state-owned railway or airline within the United States through a travel agent. We cannot believe that this is what Congress intended. Throughout the world many foreign states own and operate legally independent passenger railways and airlines, which may qualify for sovereign immunity as an “agency or instrumentality of a foreign state” under 28 U.S.C. § 1603(b).[8] Foreign states are also heavily involved in the airline industry.[9] Given the prevalence of these rail lines and airlines worldwide,[10] we believe that Congress contemplated that the sale of tickets by *597 travel agents within the United States for passage on foreign-sovereign owned common carriers would constitute “commercial activity carried on in the United States by the foreign state.” 28 U.S.C. § 1605(a)(2).
Adopting the OBB position would mean that scores of state-owned railroads and airlines worldwide could sell their tickets for foreign travel through travel agents in the United States and then claim sovereign immunity thereafter because the travel agents selling their tickets do not meet the definition of a state instrumentality under § 1603(b). Such immunity would extend not only to torts but to contract liability stemming from the actions of their common law agents in the United States. That result would mean that American citizens who buy tickets through authorized domestic agents on airlines or railroads owned by foreign governmental entities could find their reservations hot honored and their payments retained. The only recourse against the contract-breaching carrier would be to sue abroad, even though the contract was entered into in the United States. There is no reason to think Congress intended such a chaotic result.
We likewise find no support for OBB’s suggested interpretation in the FSIA’s legislative history. OBB contends that the legislative history confirms its interpretation because it says that the term “foreign state” applies consistently throughout the FSIA. According to OBB, because the term “foreign state” has a consistent definition throughout the statute,[11] “the definition of an ‘agency’ in Subsection 1603(b) limits who is an agent for purposes of Section 1605(a)(2).” We do not see the connection. That Congress intended the terms defined in § 1603 to apply consistently throughout the FSIA does not mean that Congress intended for those defined terms to displace principles of common law. Indeed, the Supreme Court has looked to common-law corporate principles to determine the proper interpretation of § 1603(b). See Dole Food Co., 538 U.S. at 474, 123 S.Ct. 1655 (relying on a “basic tenet of American corporate law” to hold that “only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement” under § 1603(b)); see also Samantar, 560 U.S. at 320, 130 S.Ct. 2278 (examining “relevant common law and international practice” to interpret the FSIA).[12]
Moreover, none of the cases relied on by OBB applied this strained reading of the FSIA. The main case on which OBB relies is the Supreme Court’s decision in Saman-tar, which held that individual officials are *598 not included within the meaning of “agency or instrumentality of a foreign state.” 560 U.S. at 316, 130 S.Ct. 2278. OBB points to a passage in the opinion that states that § 1603(b) “specifically delimits what counts as an ‘agency or instrumentality.’ ” Id. at 314, 130 S.Ct. 2278 (quoting 28 U.S.C. § 1603(b)). That is true, but So-mantar makes this statement while interpreting what or who constitutes a foreign state under the meaning of § 1603(b). Id. at 314-16, 130 S.Ct. 2278. That is the opposite question from the one we are presented with here. The other cases cited by OBB are equally unavailing and either do not address the issue or support a statutory construction contrary to that proposed by OBB. See, e.g., Gates, 54 F.3d at 1460 n. 1 (distinguishing the analysis for determining whether a defendant is an agent or instrumentality of a foreign state from the analysis for determining whether to impute the acts of an agency to the government). OBB has not convinced us that its reading of the FSIA is proper.[13] We conclude that RPE’s sale of the Eurail pass in the United States can be imputed to OBB.
2
Although imputing the sale of the pass by RPE to OBB is essential to showing that the “commercial activity was carried on in the United States,” we must still determine if that sale creates “substantial contact” with the United States. 28 U.S.C. § 1603(e). We conclude that it does.
“Substantial contact” is not clearly defined in the FSIA or by our circuit or our sister circuits. See Shapiro v. Republic of Bol., 930 F.2d 1013, 1019 (2d Cir.1991). It is generally agreed that it sets a higher standard for contact than the minimum contacts standard for due process. See id.; Mar. Int’l Nominees Establishment, 693 F.2d at 1109 (explaining that the substantial contact requirement makes “clear that the immunity determination under the first clause diverges from the ‘minimum contacts’ due process inquiry”). Under this standard, we have concluded that merely executing contracts for the sale of *599 crude oil in the United States, by itself, is not a substantial contact. Terenkian, 694 F.3d at 1137. In Terenkian, we found relevant that no activity related to the formation of the contracts other than that their execution occurred within the United States. Id. at 1126, 1137. In a different context, we have concluded that there was substantial contact where a foreign state, through its agent in the United States, advertised to and solicited customers in the United States, causing numerous Americans to stay in the foreign state’s hotel. Siderman de Blake, 965 F.2d at 709. Although in some situations the formation of a contract within the United States may not be sufficient to establish substantial contact, in other situations the advertisement to and solicitation of customers in the United States is enough. The context of the commercial activity helps to determine whether the substantial-contact requirement is met.
In the common-carrier context, we also look to factors such as the marketing, selling, and arranging of foreign travel in the United States to determine whether substantial contact exists. See Schoenberg, 930 F.2d at 781-82 (concluding that substantial contact easts where the trip was arranged and started in California); see also Santos v. Compagnie Nationale Air Fr., 934 F.2d 890, 894 (7th Cir.1991) (cataloguing cases); Sugarman v. Aeromexico, Inc., 626 F.2d 270, 272-73 (3d Cir.1980). Where a ticket for travel on a foreign common carrier is bought and paid for in the United States, we conclude that the substantial contact requirement is satisfied. See Barkanic, 822 F.2d at 14. The sale and marketing of Eurail passes within the United States is sufficient to meet the substantial-contact element and to show that OBB carried on commercial activity in the United States. It remains for us to determine whether the claims of Sachs are “based upon” this commercial activity.
B
“[T]he phrase ‘based upon’ in § 1605(a)(2) ‘is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under [his or her] theory of the case.’ ” Lasheen, 603 F.3d at 1170-71 (quoting Nelson, 507 U.S. at 357, 113 S.Ct. 1471); see also Santos, 934 F.2d at 893 (“An action is based upon the elements that prove the claim, no more and no less.”). The “based upon” language demands “more than a mere connection with, or relation to, commercial activity.” Nelson, 507 U.S. at 358, 113 S.Ct. 1471. But it is not necessary that. the entire claim be based upon the commercial activity of OBB. Sachs’s claims will be “based upon” the commercial activity if “an element of [her] claim consists in conduct that occurred in commercial activity carried on in the United States.” Sun, 201 F.3d at 1109 (quoting Sugimoto v. Exportadora De Sal, 19 F.3d 1309, 1311 (9th Cir.1994)); see also Terenkian, 694 F.3d at 1132.
To establish that her action is “based upon” OBB’s commercial activity, Sachs must show a nexus between her claims and the sale of the Eurail pass. See Sun, 201 F.3d at 1109. We look to Sachs’s theory of the case to determine if she meets this burden. See id. at 1110; see also Nelson, 507 U.S. at 357, 113 S.Ct. 1471 (considering Nelson’s theory of the case to determine jurisdiction). Sachs’s complaint asserts five claims for relief: negligence; strict liability for a design defect; strict liability for failure to warn for a design defect; breach of implied warranty of merchantability; and breach of implied warranty of fitness. “A court must analyze each claim and determine if it is ‘based upon’ commercial activity....” *600 Lasheen, 603 F.3d at 1172. We begin with Sachs’s negligence claim.
To show negligence, Sachs must establish that OBB owed her a duty of care. Under Sachs’s theory of the case, OBB owed her a duty of care because her purchase of the Eurail pass established a common-carrier/passenger relationship. It is well established that common carriers owe a duty of utmost care to their passengers. See Andrews v. United Airlines Inc., 24 F.3d 39, 40 (9th Cir.1994) (applying California law);[14] see also Restatement (Third) of Torts § 40(b) (2012) (“Special relationships giving rise to the duty [of reasonable care] ... include a common carrier with its passengers.”). And the basis for that duty of care is established when a foreign state or its agent sells a ticket or otherwise makes travel arrangements for passage abroad. See Santos, 934 F.2d at 893-94.
Here, buying the Eurail pass from RPE was the start of Sachs’s tragic misadventure, and buying the pass in the United States helped to define the scope of duty owed by common carrier OBB to the pass purchaser and traveler, Sachs. Because the sale of the Eurail pass is an essential fact that Sachs must prove to establish her passenger-carrier relationship with OBB, a nexus exists between an element of Sachs’s negligence claim and the commercial activity in the United States. See Kirkham, 429 F.3d at 292 (“[S]o long as the alleged commercial activity establishes a fact without which the plaintiff will lose, the commercial activity exception applies.... ”). Without the pass, Sachs could not have boarded, or tried to board, the OBB train in Innsbruck. Moreover, the Eurail pass created an exclusive relationship between OBB and Sachs. No one could use this pass but Sachs. The Eurail pass bore her name, said that it was non-transferrable, and required that she present a valid pass *601 port to use it. Thus, the sale of the Eurail pass in the United States is “necessary to the ‘duty of care’ element of [Sachs’s] negligence claim.” Id. To demand more at the jurisdictional phase is to require a plaintiff to prove the merits of her claim, “expanding the category of jurisdictional facts to include actions and events other than the actual commercial activity which triggers the exception.” Id. at 293.
Sachs’s purchase of the couchette reservation upgrade in Innsbruck does not change our conclusion. The passenger-carrier relationship had already been established, and the couchette purchase did not change this relationship or OBB’s duty in any way; it rather upgraded the means of her transit in Austria. OBB acknowledges that Sachs could have boarded the train from Innsbruck to Prague with just her Eurail pass, so the couchette reservation merely constitutes an upgrade to her existing pass, not a new transaction. The situation is similar to a person who buys a coach-class airline ticket but pays an additional fee for a first-class upgrade before boarding the plane. The latter is not a new transaction that changes the duty of care owed by the airline to the passenger. Similarly, Sachs’s purchase of the upgrade changed nothing about the duty of care OBB owed her. Because the sale of the Eurail pass in the United States forms the basis of an element of Sachs’s negligence claim, she satisfies the “based upon” requirement for that claim.
OBB contends that this conclusion is inconsistent with our decision in Sun v. Taiwan. We disagree. In Sun, we considered whether the appellants could bring a wrongful death action against Taiwan under the commercial-activity exception after their son drowned during a cultural tour of Taiwan. 201 F.3d at 1106. The Suns alleged that Taiwan was negligent by failing to warn their son of the swimming hazards and failing to exercise reasonable supervision. Id. at 1109. We concluded that Taiwan had engaged in commercial activity in the United States by promoting and managing applications for the program, but that this activity did not form the basis of Sun’s negligence claims. Id. at 1110. We explained that “[t]he promotion and application process in the United States was not conduct involved in proving any of the elements of the Suns’ action.” Id.[15] Sachs’s negligence claim is different from that considered in Sun because OBB’s conduct in the United States — the sale of the Eurail pass — is essential to proving the duty-of-care element of Sachs’s negligence claim.
Similarly, our conclusion is consistent with the Supreme Court’s decision in Saudi Arabia v. Nelson, which analyzed the “based upon” requirement of the commercial-activity exception. The Supreme Court concluded that Nelson’s action “alleging personal injury resulting from unlawful detention and torture by the Saudi Government [was] not ‘based upon a commercial activity’ within the meaning of [the FSIA].” Nelson, 507 U.S. at 351, 113 S.Ct. 1471. To reach this conclusion, the Court rejected Nelson’s argument that the defendant’s act of recruiting and signing a contract with Nelson in the United States was the relevant commercial activity that formed the basis of Nelson’s tort claims. Id. at 358, 113 S.Ct. 1471. Although those acts within the United States preceded the torts alleged by Nelson, they were not relevant to proving Nelson’s claims. Id. In contrast, Sachs’s negligence claim requires her to show that OBB owed her a *602 duty of care as a passenger on its train — a duty based upon the sale of the Eurail pass within the United States.
For similar reasons, we conclude that Sachs’s breach-of-implied-warranty claims and strict-liability claims are “based upon” the sale of the Eurail pass.[16] Products-liability claims and breach-of-implied-warranty claims are variations on a theme: attributing liability based on the sale of a product into the market. See Greenman v. Yuba Power Prods. Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 900-901 (1963) (discussing implied warranties and strict liability for design defects); see also Dan B. Dobbs et al., The Law of Torts § 448 (2d ed.2011) (“To a large extent, the law of implied warranty gradually merged with strict tort liability.”). A transaction between a seller and a consumer is a necessary prerequisite to proving either type of claim. See Restatement (Second) of Torts § 402A (1965) (establishing liability for those who sell products to consumers); West’s Ann. Cal. Com.Code § 2314(1) (“[A] warranty that the goods shall be merchantable is implied in a contract for their sale_”); West’s Ann. Cal. Com. Code § 2315 (establishing an implied warranty that the goods shall be fit for a particular purpose at the time of contracting). Here, the sale relevant to proving these claims is the sale of the Eurail pass to Sachs in the United States.[17] As we explained above, Sachs’s purchase of the couchette upgrade does not change our conclusion because her existing Eurail pass was a necessary precedent to the upgrade. Because the sale of the Eurail pass in the United States forms an essential element of each of Sachs’s claims, we conclude that Sachs’s claims are “based upon a commercial activity carried on in the United States” by OBB.[18] 28 U.S.C. § 1605(a)(2).
*603 V
We hold that the first clause of the FSIA commercial-activity exception applies to a common carrier owned by a foreign state that acts through a domestic agent to sell tickets to United States citizens or residents for passage on the foreign common carrier’s transportation system. Sachs has met her burden of proving that the first clause of the commercial-activity exception applies. The district court erred in concluding that it lacked subject-matter jurisdiction over Sachs’s claims. We reverse and remand for further proceedings consistent with this opinion, including consideration of the other claims raised by OBB in its motion to dismiss.[19]
REVERSED and REMANDED.

. Sachs’s complaint also named the Republic of Austria and the OBB' Holding Group as defendants. The Republic of Austria was dismissed from the lawsuit when Sachs did not oppose the Republic of Austria’s motion to dismiss. OBB Holding Group was not properly served and is not a party to this litigation.

. Under this practice, the State Department would usually file a suggestion of immunity in the court at the request of the foreign state and the district court would grant immunity on that basis. Peterson v. Islamic Republic of Iran, 627 F.3d 1117, 1126 (9th Cir.2010). In the absence of suggestion from the State Department, the district court would determine jurisdiction based on the established policy of the State Department. Id.

. “Courts have construed this commercial activity provision to have three independent clauses, and have used different criteria for each of the three separate clauses to assess a claimed exception.” Terenkian, 694 F.3d at 1127. We review only the first of these clauses here, and we use the term "commercial-activity exception" to refer only to that clause.

. The district court concluded, based on the agreement of the parties, that "the only relevant commercial activity within the United States was plaintiff's March 2007 purchase of a Eurail pass from the Rail Pass Experts.” We consider only the relevant conduct as defined by the district court. See Schoenberg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 781 (9th Cir.1991) (accepting the district court’s definition of relevant conduct when not clearly erroneous).

. The dissent of Judge O’Scannlain virtually ignores (and the dissent of Chief Judge Kozin-ski entirely ignores) the two cases that are most like this one, Kirkham v. Société Air France, 429 F.3d 288, 290, 293 (D.C.Cir. 2005), and Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China, 822 F.2d 11 (2d Cir.1987), by arguing that those considered decisions of the D.C. Circuit in Kirkham and the Second Circuit in Barkanic "do not analyze when the acts of agents can be attributed to a foreign state.” Judge O'Scannlain Dissent at 609. We agree that the issue was not explicitly raised in those opinions, as noted in the dissent on the three-judge panel, but we do not agree with the argument by the dissent of Judge O’Scannlain on this en banc panel aimed at discrediting the force of these cases for us. Further, the dissent of Judge O’Scannlain does not acknowledge that its view, if adopted, would create a circuit split with those decisions of the D.C. Circuit and Second Circuit. At the time our prior three-judge panel had decided this case, the jurisdictional argument on which the dissent of Judge O’Scannlain relies had not even been raised by the Republic of Austria in its briefing or in 'its oral argument. Because the issue is jurisdictional, we have considered the Republic of Austria's new contentions about agency even though they were not previously presented. Infra note 7. Whether or not in Barkanic the government of the People’s Republic of China conceded agency from the sale of its ticket by a travel agent in the United States, and whether or not in Kirkham the government of France conceded agency from the sale of its ticket by a travel agent in the United States, is beside the point. Because the issue is jurisdictional, these other circuits, like us, had an independent duty to assess jurisdiction. If the sale by the travel agent was not sufficient for jurisdictional purposes, then the district courts would have been without jurisdiction and the circuit courts should not have proceeded to render decision accepting that the district courts had jurisdiction over the foreign common carriers by virtue of the commercial-activity exception, and the sale in the United States by the travel agency. Thus the position of the dissent of Judge O’Scannlain creates a conflict ■ with the two other United States Courts of Appeals that have considered parallel cases where a travel agent in the United States sold a ticket for passage on a common carrier owned by a foreign government. We do not disagree that there could be "many instances in which Americans who wish to sue foreign sovereigns can only do so overseas,” Judge O’Scannlain Dissent at 610, but there is no reason to think that Congress intended that result when a foreign common carrier sells tickets targeting Americans through agents in the United States. The dissent of Judge O’Scannlain notes that the general rule requiring suit of foreign sovereigns only overseas is a result Congress intended "in many instances,” id., but the dissent of Judge O’Scannlain fails to give credence to the plain meaning of the language Congress inserted excepting the situation when the foreign sovereign has engaged in commercial activity in the United States from which a claim springs.

. We also agree with Sachs that even if we were to conclude that the sale was originally • unauthorized, this ratification of the pass by OBB gives it the "effect as if originally au *594 thorized.’ Rayonier, Inc. v. Poison, 400 F.2d 909, 915 (9th Cir.1968).

. OBB did not initially brief this argument before our court. We do not consider it waived, however, because it goes to our independent duty to determine subject-matter jurisdiction. See Lasheen, 603 F.3d at 1171 n. 3 ("[C]hallenges to subject-matter jurisdiction cannot be waived...Also, after oral argument we ordered supplemental briefing on this issue.

. For instance, Canada, India, Israel, Korea, and Thailand each provides passenger services through state-owned railways. See Via Rail Canada, Inc., http://www.viarail.ca/en/ about-via-rail (last visited November 15, 2013); Indian Railways, http://www. indianrailways.gov.in/# (last visited November 15, 2013); Israel Railways, http://www. rail.co.il/EN/About/Pages/ about.aspx (last visited November 15, 2013); Korail Korean Railroad, http://www.korail.com/en/ (last visited November 15, 2013); State Railway of Thailand, http://www.railway.co.th/home/srt/ about/history.asp?lenguage=Eng (last visited November 15, 2013).

. According to an unofficial 2008 compilation by the United Nations's International Civil Aviation Organization the following airlines, and many others, are 51 to 100 percent government owned: Aeroflot Russian Airlines, Air Botswana, Air Burundi, Air China, Air India, Air Jamaica, Air Madagascar, Air Malawi, Air Tanzania, Air Zimbabwe, Ba-hamasair, Belavia Belarusian Airlines, Bulgaria Air, Cameroon Airlines, Cayman Airways, Croatia Airlines, CSA Czech Airlines, Cubana de Aviación, Druk Air (Royal Bhutan Airlines), Egyptair, Emirates Airlines, Eritrean Airlines, Ethiopian Airlines, Finnair, Ga-ñida Indonesia, Ghana International Airlines, Lao Airlines, Libyan Arab Airlines, LOT Polish Airlines, Malaysia Airlines, Myan-ma Airways (Myanmar), Orbi Georgian Airways, Pakistan International Airlines, Polynesian Airlines (Samoa), Royal Nepal Airlines, Rwanda Air Express, Saudi Arabian Airlines, Singapore Airlines, South African Airways, TAP Portugal, and Vietnam Airlines. List of Government-owned and Privatized Airlines (unofficial preliminary compilation), Int'l Civil Aviation Org., (July 4, 2008), available at http://www.icao.int/sustainability/ Documents/PrivatizedAirlines.pdf.

.We observe the existence of these foreign-state owned railways and airlines as legislative, rather than adjudicative, facts because of their relevance to our "legal reasoning” and interpretation of the "lawmaking process.” Fed.R.Evid. 201(a), advisory note to 1972 amendments; see also Kenneth Culp Davis, Judicial Notice, 55 Colum. L.Rev. 945, 952 (1955) (explaining that a court may "resort to legislative facts, whether or not those facts have been developed on the record”). Even if we were to view the existence of state-owned railroads and airlines as adjudicative facts, it would still be correct to recognize their existence as a matter of judicial notice. We may take judicial notice of an adjudicative fact “that is not subject to reasonable dispute” because it is either "generally known within the trial court’s territorial jurisdiction” or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.” Fed.R.Evid. 201(b). There might be dispute about whether any particular airline or railroad is state owned. Ownership may have changed; government carriers may have been privatized. There might also be a problem of where to draw the line on percentage of ownership required for the presumption of immunity. But whatever the detail as to particular carriers, it cannot reasonably be disputed that there are many national airlines and railroads worldwide that may market and sell tickets through agents or subagents in the United States. The existence of a state-owned carrier can be shown by reference to government websites and papers of the governments and reviewing agencies.

. Section 1608 employs a different definition of "foreign state.” See 28 U.S.C. § 1603(a).

. In addition to asking us first to adopt what we think is a strained reading of the statute, OBB asks us next to preserve the Bancec presumption of separate juridical status to be applied after we determine agency under § 1603(b). That is, OBB argues that the definition of "agency” under § 1603(b) did not fully abrogate common-law principles of agency but preserved the common law as a second requirement for establishing agency. Under that analysis, we would first determine whether an entity met the elements enumerated in § 1603(b) and, if so, we would determine whether that entity met Bancec's standard for overcoming the presumption of separate juridical status.
This analytical framework is untenable. We know of no principle of statutory construction, and OBB cites to none, that supports reading a statute to create a hierarchical system that first requires application of a statutory definition and then allows consideration of the common-law definition for the same term. It seems that OBB would like to construct a gantlet through which no claimant could run, a barrier no claimant could surmount. The plain language of the FSIA does not support such a framework, as explained above.

. The dissent of Judge O'Scannlain cites the “Presumption of Consistent Usage” canon, which stands for the proposition that a “word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning.” Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012). In the statute, there are different phrasings of "agency or instrumentality of a foreign state”, 28 U.S.C. § 1603(b), and “agent of that foreign state ... acting within the scope of his or her ... agency,” id. § 1605A(c), and the commercial-activity exception, id. § 1605(a)(2), which does not include the word "agency.” We do not have text from one part of the statute interpreted differently from the same text in another part of the statute. While not applying correctly the maxim of consistent usage, the dissent of Judge O’Scannlain also ignores other statutory construction principles pointing in the direction that an "agent” for purposes of satisfying the commercial-activity exception is not the same as an “agency or instrumentality of a foreign state” for purposes of invoking sovereign immunity. Some of these other principles are: the surplusage canon ("every word and every provision is to be given effect”), the harmonious reading canon ("the provisions of a text should be interpreted in a way that renders them compatible, not contradictory”), the associated words canon ("associated words bear on one another’s meaning (nosci-tur a sociis)”), and the prior construction canon ("If a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort ... they are to be understood according to that construction”). See Scalia & Garner, 174, 181, 195, 322. All of these canons suggest that "agency or instrumentality of a foreign state” must be interpreted as an entire phrase, and that the definitions within § 1603(b) do not supplant or implicate the common law definition of agency which can be taken into account in assessing § 1605(a)(2).

. Some courts have said that "as a general matter, state substantive law is controlling in FSIA cases.” E.g., Barkanic v. General Administration of Civil Aviation of the People's Republic of China, 923 F.2d 957, 959 (2d Cir.1991) (citing Bancec, 462 U.S. at 622 n. 11, 103 S.Ct. 2591). The Supreme Court in Bancec stated in pertinent part: "Section 1606 provides that '[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity ..., the foreign state shall be liable in the same manner and to the same extent as a private individual in like circumstances.’ Thus, where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances.” Bancec, 462 U.S. at 622 n. 11, 103 S.Ct. 2591 (quoting 28 U.S.C. § 1606). So we think it is a permissible view of Supreme Court precedent to look to California law to determine the elements of Sachs’s claims.
However, it may also be permissible to view the above cases as suggesting there be a choice-of-law decision, either based on the forum’s choice of law principles, or some other rule. We have held that, with no choice-of-law provision expressed in the FSIA, we should use the choice-of-law principles of the federal common law, which leads us to the Second Restatement of Conflicts. See Schoenberg, 930 F.2d at 782. The Second Restatement factors for the "more significant relationship” test include: the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states; the protection of justified expectations; the policies underlying a field of law; ideas on certainty, predictability, and uniformity of result; and ease in determination and application of applicable law. Id. at 783; see Restatement (Second) of Conflicts § 6(2) (1971). Even if we should make a separate conflicts analysis under the Restatement, that conflicts analysis supports the same conclusion that California law applies to Sachs's claims. Although Sachs was injured in Austria, the purchase of the common carrier ticket occurred in California. California has a strong interest in providing compensation to its residents under its law when those residents buy a common carrier ticket in California and then travel abroad on state-owned transportation.

. The Suns later claimed that the organization of the trip in the United States established a duty of care, but because that was a new issue on appeal, we did not decide it. Sun, 201 F.3d at 1110 & n. 2.

. We review Sachs’s claims only to the extent necessary to determine whether jurisdiction exists under the FSIA. Whether Sachs has properly pleaded these claims is not before us. See Kirkham, 429 F.3d at 293 (explaining that the jurisdictional inquiry under the FSIA is distinct from the Rule 12(b)(6) analysis).

. The dissent of Judge O’Scannlain does not contest that if the ticket sale of the Eurail pass to Sachs in the United States was commercial activity of OBB, then the negligence claim is based on that conduct in the sense that one of the elements of negligence is the creation of the duty of the common carrier. But the dissent of Judge O'Scannlain argues that strict liability stands on a different footing because that claim does not require privity of contract. This misses the point. Under the standard formulation for strict liability for harm to a consumer, there must be a sale of the product. See Restatement (Second) of Torts § 402A (1965). Here, the sale by RPE was in the United States, and there is jurisdiction on the strict liability claim.

. Chief Judge Kozinski, though he joins Judge O’Scannlain's dissenting analysis, launches his own independent theory to take agency out of the case. Thus, Chief Judge Kozinski’s dissent argues that even if the Eu-rail pass tickets here sold by DBB's agent had been sold directly by Austria “from a kiosk in Times Square,” Chief Judge Kozinski Dissent at 611, nonetheless, Sachs’s claims would not be based upon commercial activity in the United States. To reach this conclusion, Chief Judge Kozinski would simply overrule all prior case law in the Ninth Circuit which had held that it was sufficient if an element of the claim was supported by the domestic commercial activity. Chief Judge Kozinski, in his separate dissent, does not persuasively rebut the reasoning of our precedents holding, or the Supreme Court’s prior opinion in Nelson, 507 U.S. at 358 n. 4, 113 S.Ct. 1471, leaving open, that commercial activity in the United States, supporting an element of a claim, was sufficient for jurisdictional purposes.
Further, the cases that Chief Judge Kozin-ski relies upon do not have the type of nexus to the United States that would be created, using his hypothetical example, by Austria itself selling its Eurail pass tickets from a kiosk in Times Square. Sosa concerned a *603 Mexican physician's suit against the United States under the Federal Tort Claims Act, after he was seized by Mexican nationals in Mexico at the behest of the U.S. Drug Enforcement Agency. See Sosa v. Alvarez-Machain, 542 U.S. 692, 697-98, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Sosa did not involve the FSIA. Kiobel concerned the alleged complicity of foreign corporations with the Nigerian government for atrocities committed in Nigeria against Nigerian citizens, in violation of international law norms. See Kiobel v. Royal Dutch Petroleum Co.,-U.S.-, 133 S.Ct. 1659, 1662-63, 185 L.Ed.2d 671 (2013). Kiobel was an Alien Tort Statute case, and did not involve the FSIA. Morrison concerned securities transactions that neither occurred in the United States nor involved securities listed on U.S. exchanges. See Morrison v. Nat’l Australia Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 2884, 177 L.Ed.2d 535 (2010). Morrison did not involve the FSIA.
Cases like Sosa, Kiobel, and Morrison, while they caution against opening U.S. courts or applying U.S. laws to foreign activities of foreign entities, do not engage with the commercial-activity exception of the FSIA, and do not properly bear on whether that exception can be satisfied by a foreign country selling common carrier tickets through a kiosk in Times Square, Chief Judge Kozinski’s hypothetical, or on the practice of foreign sovereign airlines or rail systems selling tickets in the United States through travel agents within the United States. Congress enacted the commercial-activity exception so that foreign sovereigns, if they engaged in commercial activity in the United States, could be called into account in our courts.

. Whether Sachs can successfully pursue her claims depends on a great many issues that are not presently before us. We express no view on those issues.